Filed 3/12/21  In re Y.G.-S CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Y.G.-S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Y.S. et al., <br><br> Defendants and Appellants. | D078002 <br><br> (Super. Ct. No. SJ13363A–C) |

APPEALS from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Donna P. Chirco, under appointment by the Court of Appeal, for Minors.

Office of County Counsel, County of San Diego, Caitlin E. Rae, Chief Deputy, and Patrice Plattner-Grainger, Senior Deputy, for Plaintiff and Respondent.

I

INTRODUCTION

Y.S. (Mother) and her children, Y.G.-S., G.G.-S., and L.G. (collectively, the Minors), appeal a juvenile court order summarily denying a petition filed by Mother under Welfare and Institutions Code section 388.[1]  The petition requested modification of previously-entered orders terminating family reunification services and setting a permanency hearing under section 366.26.  Mother and the Minors also challenge a juvenile court order designating the Minors' paternal grandparents as their legal guardians and terminating the court's jurisdiction.

Finding no error, we affirm the challenged orders.

II

BACKGROUND

A

Mother has six children including the Minors and their three younger half-siblings.  R.C. is Mother's former boyfriend, the father of two of the Minors' three half-siblings, and the perpetrator of certain acts of domestic violence giving rise to these dependency proceedings.

In June 2016, Mother and R.C. got into an altercation while removing their child from his car seat.  During the incident, R.C. punched Mother in the jaw and pulled her hair.  The incident was reported to the San Diego County Health and Human Services Agency (the Agency) and Mother signed

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

a safety plan stating R.C. would have no contact with her children. Mother also agreed to obtain, and subsequently did obtain, a criminal protective order prohibiting R.C. from contacting Mother except for peaceful contact.

A few days after the incident just discussed, R.C. visited Mother's residence. He became aggressive, got into an altercation with the maternal grandmother, and threw a lamp at the maternal grandmother's vehicle. After the incident, Mother agreed to voluntary services and a case plan requiring her to participate in a domestic violence group and parenting services. The case plan permitted R.C. to have supervised contact with the children, but prohibited Mother from supervising the visits or being in the vicinity during the visits. Over the next six months, Mother failed to participate in any voluntary services.

In December 2016, Mother and her children moved into a new residence. Shortly after the move, the Agency received a report that R.C. had visited Mother's new residence multiple times. Law enforcement visited the residence on a welfare check and found that R.C. was present. They asked R.C. to leave and he complied. Mother admitted she contacted R.C. because their child was sick and Mother needed a ride to the hospital. A week after the welfare check, Mother signed an updated case plan prohibiting her from having any contact with R.C. if any of her children were present.

In March 2017, Mother and R.C. got into another altercation, this time at Mother's residence and in the presence of the Minors' half-siblings. During the incident, R.C. ripped apart a child's playpen and Mother poured a bottle of bleach from an upper-level floor onto R.C., who was situated on a lower-level stairway. R.C. contacted law enforcement and Mother, who was pregnant at the time, was arrested for assault with a caustic chemical. The Minors were removed and placed with the maternal grandmother per the

safety plan.  During the investigation into the incident, the Minors reported that R.C. regularly spent the night at Mother's new residence and Mother and R.C. had gotten in at least one other recent altercation.

B

Shortly after, the Agency filed dependency petitions on behalf of the Minors under section 300, subdivision (b).  The petitions alleged the Minors had suffered, or there was a substantial risk they would suffer, serious physical harm or illness as a result of Mother's failure or inability to supervise or protect them adequately.[2]

At the contested jurisdiction and disposition hearing, the juvenile court sustained the petitions and declared the Minors dependents of the court.  The court removed the Minors from parental custody, ordered them placed with an approved relative, and ordered family reunification services.

During the initial six-month reunification period, Mother and R.C. had mostly peaceful contacts except for one negative contact that could not be substantiated.  Mother visited the Minors several times per week and completed 15 domestic violence group classes.  However, she did not participate in any parenting classes and missed 11 domestic violence group classes because of doctor's appointments related to her high-risk pregnancy.  Midway through the reunification period, Mother gave birth to her sixth child (and her second child with R.C.).  At the six-month review hearing, the court continued the minors as dependents and ordered additional family reunification services.

During the second six months of reunification, Mother completed her domestic violence group classes and a parenting course.  She attended college

---

[2]    The Agency filed separate petitions on behalf of the Minors' half-siblings.

4

courses in pursuit of an occupational certification. Further, she maintained regular visitations with the Minors. On one occasion, R.C. showed up to the maternal grandfather's home and an altercation between Mother and R.C. ensued. R.C. pleaded guilty to criminal charges relating to the incident.

At the 12-month review hearing, the juvenile court found the conditions justifying the initial assumption of jurisdiction still existed and again ordered the Minors be continued as dependents of the court. However, the court found Mother made excellent progress toward alleviating or mitigating the causes necessitating placement outside the home. The court ordered additional family reunification services and placement of the Minors with Mother.

C

Mother, the maternal grandmother, and the Minors resided together in the maternal grandmother's home after the 12-month review hearing. However, in September 2018, the Agency received a report that Mother and R.C. were back together and Mother was sneaking R.C. into her residence while the maternal grandmother was away. The report stated the Minors were afraid of R.C. and wanted the maternal grandmother to care for them. Mother denied the allegations.

In October 2018, Mother and R.C. got into a violent altercation in the presence of one of the Minors' half-siblings. According to Mother, she met with R.C. because she hoped he would pay for a vehicle she had rented. During the encounter, Mother and R.C. began arguing about Mother's romantic life and R.C. broke the window to Mother's rental car, pulled her hair, grabbed her throat, and hit her in the rib cage. Mother was treated for her injuries at a hospital and R.C. was arrested for domestic battery and vandalism.

After the incident, the Agency filed supplemental petitions on behalf of the Minors and two of their half-siblings, as well as an initial petition on behalf of the Minors' youngest half-sibling. The petitions alleged placement with Mother was no longer appropriate due to her continued violations of the criminal protective order.

Mother signed an updated safety plan stating she would immediately leave the residence until further notice while the maternal grandmother and Mother's children remained there. According to the social worker, R.C. had been released from custody and the social worker believed there was a high risk of an imminent domestic violence incident if she remained in the home. A few days after Mother signed the updated safety plan, it was disclosed to the Agency that Mother stayed at the residence with her children. As a result, the children were removed from the maternal grandmother's care and detained with a maternal great aunt.

In January 2019, at the contested jurisdiction and disposition hearing, the court sustained the petitions, terminated family reunification services, and set a permanency hearing under section 366.26. The court ordered placement with an approved relative and ordered a placement evaluation for all relatives.

In April 2019, the Minors were placed with their paternal grandparents.[3] The Minors were in good physical health and received weekly therapy in the care of the paternal grandparents. However, the paternal grandparents were initially uncertain whether they wanted to adopt the Minors or assume legal guardianship. For this reason, among others, the Agency requested a series of continuances for the section 366.26 hearing to

---

[3] The Minors' half-siblings were placed with a non-relative extended family member and were later placed with a maternal great aunt.

6

assess the most appropriate permanent plan for the Minors.  The juvenile court granted the continuances.

Throughout the year, the Agency and law enforcement received reports that Mother and R.C. were in contact in violation of the criminal protective order.  The Agency received a report from one of R.C.'s family members stating she witnessed Mother and R.C. in an argument outside the family member's home in June 2019.  During the argument, Mother and R.C. reportedly hit and screamed at one another.  Another one of R.C.'s family members reported she observed Mother and R.C. together at a bank in July 2019.  Mother and R.C. reportedly asked the family member not to say anything about seeing them together.  In September 2019, Mother herself reported to law enforcement that she had received several phone calls and voice messages from R.C. in the preceding weeks.  In October 2019, and again in December 2019, the Agency received reports that R.C.'s family members observed Mother and R.C. together outside the maternal grandmother's residence.

On February 3, 2020, R.C. and Mother got into another altercation while they were driving together to a juvenile court hearing.  Mother reported to law enforcement that R.C. became agitated during the drive, pinched her hard on the arm, yelled at her, tried to take away her phone, and would not allow her out of the vehicle.  She reported they were in an altercation the prior afternoon as well, during which R.C. pulled her hair and scratched her.  Mother told the interviewing officer she had been dating R.C. on and off for the better part of 15 years, R.C. physically and emotionally abused her for most of their relationship, and the "abuse was relentless and ongoing."  She disclaimed any knowledge of the criminal protective order.

R.C. was arrested and charged with domestic violence with corporal injury and violation of the criminal protective order. He denied any physical altercation with Mother. However, he admitted he violated the criminal protective order, acknowledged there was a dispute the day before the driving incident, and asserted Mother had damaged his vehicle with a baseball bat during the dispute.

D

The section 366.26 hearing was continued several times due to the COVID-19 pandemic, among other reasons, and set for September 25, 2020.

In an addendum report dated September 25, 2020, the Agency recommended that jurisdiction be terminated and the paternal grandparents be appointed as legal guardians for the Minors. The report stated the paternal grandparents were committed to a legal guardianship, eligible for guardianship assistance funding, and had "been able to meet the children's basic and emotional needs and keep the three siblings together." Further, it noted the Minors had been placed with the paternal grandparents since April 2019, did not want to be adopted, and were doing well in the care of the paternal grandparents.

The addendum report recounted two recent familial developments as well. First, it stated Mother moved into a new apartment in mid-September 2020. Second, it stated the Agency received a report from the paternal grandparents that Mother and Y.G.-S. (one of the Minors) got into an altercation. During the altercation, Mother reportedly threatened to hit Y.G.-S. Mother admitted she got into an argument with Y.G.-S., but stated Y.G.-S. had been very disrespectful with her and cussed at her.

On September 25, 2020, the day of the contested section 366.26 hearing, Mother filed a petition under section 388 requesting modification of

8

the orders terminating family reunification services and scheduling a section 366.26 hearing. She requested the Minors be placed with her or, in the alternative, the provision of additional family reunification services. She alleged the modification was warranted because she was employed, had not been involved in a domestic violence incident for almost eight months, and promised not to have contact with R.C. Further, she alleged the modification was in the Minors' best interests because they regularly asked to go home with her and were bonded with their half-siblings. The Minors joined Mothers' request for an evidentiary hearing on the section 388 petition.

The juvenile court found Mother did not make a prima facie showing and denied the section 388 petition without setting an evidentiary hearing. The court opined that while there was "no doubt" Mother loved the Minors, the eight-month period without domestic abuse was merely an "artificial calm produced by the incarceration of [R.C.]." The court further opined that Mother's desire to parent Minors "seem[ed] to wane at moments when [R.C.] [was] available," and R.C. would be "available again in short order because his commitment [was] almost over."

Thereafter, the court accepted the Agency's recommendations with modifications not pertinent to this appeal, appointed the paternal grandparents as legal guardians for the Minors, and terminated jurisdiction.

III

DISCUSSION

Mother and the Minors appeal the order summarily denying the section 388 petition without setting an evidentiary hearing.

Under section 388, subdivision (a)(1), any parent or other person having an interest in a dependent may petition to change, modify, or set aside a prior order of the juvenile court. The section 388 modification

9

procedure is an " ' "escape mechanism" when parents complete a reformation in the short, final period after the termination of reunification services but before the [implementation of a permanency plan].' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) To obtain relief, the petitioner bears the burden of establishing: (1) a change of circumstance or new evidence; and (2) the change, modification, or set-aside is in the best interests of the minor. (§ 388, subds. (a)(1) & (d); *In re Z.F.* (2016) 248 Cal.App.4th 68, 72–73.)

If the liberally-construed allegations of the petition make a prima facie showing that these elements are satisfied, the petitioner is entitled to an evidentiary hearing. (§ 388, subd. (d); *In re Hunter* W. (2011) 200 Cal.App.4th 1454, 1463.) However, if they " 'do not make a prima facie showing of changed circumstances [or new evidence] and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445 (*Daniel C.*); see Cal. Rules of Court, rule 5.570(d).) A prima facie showing is made when " 'the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.' " (*Daniel C.*, at p. 1445.) "In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62 (*K.L.*).)

We typically apply an abuse of discretion standard of review when reviewing the denial of a section 388 petition without an evidentiary hearing. (*K.L.*, *supra*, 248 Cal.App.4th at p. 62; see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.) "An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination." (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)

" 'The denial of a section 388 [petition] rarely merits reversal as an abuse of discretion.' " (*Daniel C.*, *supra*, 141 Cal.App.4th at p. 1445.)

Mother and the Minors assert two arguments in support of their claim that Mother made a prima facie showing of changed circumstances: (1) at the time Mother filed her petition, she was committed to avoiding R.C. and had not been involved in a domestic violence incident for nearly eight months; and (2) Mother demonstrated newfound responsibility by pursuing an occupational certification and obtaining employment and a new apartment.

As to the first argument, we conclude it was proper for the juvenile court to find that Mother remained abuse-free for eight months solely due to R.C.'s temporary incarceration and, as a result, there was not a prima facie change of circumstances. Over these four years of proceedings, R.C. and Mother routinely contacted one another in violation of the criminal protective order and engaged in acts of domestic violence, some of which led to hospitalizations and arrests. Many of these incidents occurred after Mother completed domestic violence group classes intended to equip her with the ability to avoid, identify, and deescalate domestic violence situations, which suggests Mother had not gained these critical skills. Further, as described, R.C. has been in and out of custody throughout these proceedings. The domestic violence incidents briefly stopped during his prior bouts of incarceration, but recurred time and again upon his release from custody. We have every hope that the domestic violence between Mother and R.C. is finally at an end. However, based on the 15-year record of abuse between them, the juvenile court reasonably found that the eight-month absence of domestic abuse was an "artificial calm," not a true change of circumstances.

As to the second argument, we conclude the juvenile court reasonably found that Mother's attainment of occupational certification, employment,

11

and an apartment—while certainly laudable achievements—did not constitute changed circumstances. The protective issue giving rise to these proceedings was the ongoing cycle of domestic violence between Mother and R.C. Changes to Mother's employment status or living situation would not alleviate or mitigate this unresolved protective issue. (See *In re D.R.* (2011) 193 Cal.App.4th 1494, 1512 [in assessing a section 388 petition, a court must assess the seriousness of the reason for the dependency and the nature of the changed circumstances].) That is especially so given that most of the domestic violence incidents disclosed in the appellate record occurred while Mother and R.C. were already living apart from one another.

A petition seeking relief under section 388 " 'must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests.' " (*K.L., supra*, 248 Cal.App.4th at p. 61.) Because Mother did not sufficiently allege changed circumstances, the juvenile court properly denied Mother's petition. For the same reason, it is unnecessary for us to determine whether Mother sufficiently alleged that her proposed modification would be in the Minors' best interests.

As previously noted, Mother and the Minors also seek reversal of the juvenile court order appointing the paternal grandparents as the Minors' legal guardians and terminating jurisdiction. Their challenge is based solely on grounds that the court erred in denying Mother's section 388 petition and conducting a permanency hearing. Because the juvenile court did not abuse its discretion in denying Mother's section 388 petition, there is no basis to disturb the order appointing the paternal grandparents as legal guardians and terminating jurisdiction.

IV

DISPOSITION

The orders are affirmed.


McCONNELL, P. J.

WE CONCUR:


AARON, J.


DATO, J.